# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STEPHANIE PATTERSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 15 C 8852 ) ) Judge Sara L. Ellis |
| OFFICER DAVE REMER, OFFICER SHAWN WASCHER,[1] and SERGEANT DOUGLAS MAY, | ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Finding Plaintiff Stephanie Patterson's two children alone in a motel room that appeared unsafe and unhealthy for the children, Defendants, Joliet Police Officers Dave Remer and Shawn Wascher and Sergeant Douglas May, arrested Patterson for child endangerment. After a judge found her not guilty on that charge, Patterson filed this civil rights suit against Defendants, claiming that they falsely arrested her in violation of the Fourth Amendment. Defendants have filed a motion for summary judgment. Because the Court finds that Defendants had probable cause to arrest Patterson or, alternatively, that they are protected by qualified immunity, the Court grants Defendants' motion and enters judgment for Defendants on Patterson's claims.

---

[1] Patterson named Sean Washer, but the parties do not dispute that the appropriate spelling of the defendant's name is Shawn Wascher. The Court thus substitutes Shawn Wascher into the caption of the case and as a named Defendant for Sean Washer.

## BACKGROUND[2]

On January 1, 2015, Patterson lived in Room 235 at the Star Inn, a motel in Joliet, with her husband, Peji Patterson, and their children, a one-year old and a five-month old. Around noon that day, Patterson and Peji got into a fight, which began when Patterson found a female razor that did not belong to her in Peji's pants' pocket. Patterson accused Peji of cheating and told him she was done with their relationship. Peji grabbed Patterson by the hair and dragged her across the room while insisting that the razor belonged to her. As Patterson tried to push Peji off her, he slapped her across the face and pushed her down, beating her to the point that she lost consciousness. When she regained conciousness, she noticed she had blood dripping from her face. She told Peji to get it over with and kill her. Patterson then heard her one-year old crying and moved past Peji to sit with her son. The next thing Patterson remembers is sitting in her car.

At 1:11 p.m., Wascher and Remer responded to a call from the Star Inn regarding a disturbance. Wascher described the Star Inn as one of the worst hotels in Joliet, requiring many police service calls for drug activity, unwanted people, people breaking things, overdoses, and deaths. Remer similarly indicated that he knew Star Inn to be in a high-crime area and believed it was not a safe place for children.

When Wascher and Remer arrived at the Star Inn, they knocked on doors searching for the reported disturbance with the assistance of a motel employee. They found a child alone in Room 235. Wascher entered the room and observed the child wearing a dirty shirt and found his diaper filled with urine. The child was chewing on a cigarette lighter, which Wascher removed from the child's mouth. Wascher then felt something moving on the floor and found a car seat

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and Patterson's Statement of Additional Facts. Although many of Patterson's additional facts are undisputed and so should have been included in the parties' Joint Statement, because Defendants do not object to them, the Court considers them in this case but warns Patterson to take care to follow the Court's standing orders. All facts are taken in the light most favorable to Patterson, the non-movant.

covered by two black pillows. Lifting the pillows, Wascher found the child's younger sibling strapped in the car seat. He also was wearing a dirty shirt and had a dirty diaper. Both children's diapers had last been changed around 7:30 or 8:00 a.m. Wascher did not find any adults in the room. While the officers investigated, the older child continued to pick items up off the ground, including a razor and old baby bottle, and attempted to place them in his mouth. He also tried to play with spaghetti that was left in an uncovered dish on the floor and drink from a closed bottle of baby oil.

The officers found Room 235 to be smelly and cold, with a dirty carpet, closed alcohol on a table, diapers strewn on the floor, beer bottles on the floor and sink counter, and old and used baby bottles, clothes, and trash scattered throughout the room.[3] Patterson had purchased the bottle of alcohol for Peji, and he had been drinking it the day before. The table was approximately four feet high, and the items on it, according to Patterson, were beyond her childrens' reach. An open cup of liquid was on a table, which Wascher noted smelled like alcohol. There was also an open bottle of cranberry juice on the floor next to the bed, which Peji had been drinking the night before. Electrical cords from a hot plate, hair straightener, and cell phone charger hung down toward the floor from the sink countertop. A baggie on the floor by the room window contained remnants of a green leafy substance appearing to be marijuana. At her deposition, Patterson denied that the baggie belonged to her or knowing to whom it belonged. But Peji smoked marijuana every day, and Patterson had complained to him about smoking marijuana in front of their children in the motel room. Patterson testified that the condition of the room was due to Peji dragging her around the room by her hair and his subsequent beating of her.

---

[3] Patterson testified she had removed all soiled diapers from the room and taken out the garbage on the morning of January 1, but the parties agree that the officers found the room with diapers piled in the corner and trash on the ground.

Wascher spoke with several individuals outside of Room 235 in an attempt to find the children's parents. He learned their names—Stephanie and Peji Patterson—and then found Patterson seated in a car in the parking lot. The car was parked below the balcony to Room 235. Patterson had been sitting in the car when the police officers arrived and saw them walking on the balcony and heard them knocking on doors and walking by her room asking if anybody was there. She did not leave the car, however, until approached by Remer. Remer asked Patterson if the children in Room 235 were hers, to which she responded affirmatively. Remer indicated the children were alone in the room, to which Patterson responded she did not know that Peji had left the room. She further said she was smoking a cigarette in the car because she did not like to smoke in front of her children. She later told the officers she had gone to the store to get toilet paper. When Wascher asked Patterson whether they would find toilet paper in the car, she said she did not have any because when she got to the store, she had no money and so returned to the Star Inn. Neither of these stories was true. After Patterson returned to the room, she made her children bottles and changed their diapers. When Wascher indicated that she needed to talk to Patterson, Patterson for the first time pulled her hair back to reveal an injury to her scalp. Patterson explained that she had been in a fight with Peji, he injured her and knocked her unconscious, and she subsequently fled the room. Patterson did not explain why she did not call the police after the fight. She also did not discuss how the room came to be in the condition in which the police officers found it because the topic did not come up and she did not raise it. The officers called an ambulance, which took Patterson to the hospital for treatment.

When May arrived at the Star Inn, he spoke to Wascher and Remer about the situation and what they found in the room. He took photographs of the room to memorialize its condition. Based on the condition of the room and children and the fact that the children were left

unattended in the room, May directed Remer to arrest Patterson for child endangerment. Remer effectuated the arrest after Patterson received treated for her injuries at the hospital and arrived at the Joliet Police Station. Wascher took temporary custody of the children, bringing them to the Joliet Police Station. Wascher reported the incident to the Illinois Department of Children and Family Services ("DCFS"). A DCFS child protection advanced specialist, Deorea Sanders, received the assignment to investigate the claims of child endangerment. She made contact with Wascher, Patterson's grandmother, Norma Winter, and the children at the Joliet Police Station around 5:40 p.m. on January 1. Sanders noted that the children smelled and that their clothes and belongings were soiled. DCFS took protective custody of the children and placed them in Winter's temporary custody. After conducting its investigation, DCFS issued findings against both Patterson and Peji for child neglect and indicated them for a substantial risk of physical injury, an environment injurious to health and welfare by neglect, and inadequate supervision.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

5

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**ANALYSIS**

Defendants argue that they had probable cause to arrest Patterson, the existence of which defeats her false arrest claim. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679–80 (7th Cir. 2007) ("If the officer had probable cause to believe that the person he arrested was involved in criminal activity, then a Fourth Amendment claim for false arrest is foreclosed."). "A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief" that the individual has committed a crime. *See id.* at 679. To evaluate probable cause, the Court makes an objective examination of the facts and determines what conclusions an arresting officer might have reasonably drawn from those facts. *Id.*

Alternatively, Defendants contend that qualified immunity protects them from Patterson's claim. Qualified immunity protects an officer from civil liability stemming from discretionary functions so long as his conduct does not violate a clearly established statutory or constitutional right about which a reasonable officer would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Thus, qualified immunity protects Defendants if a reasonable officer could have believed that he had probable cause to arrest Patterson in light of the information Defendants possessed at the time. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991). Courts have referred to this standard as "arguable probable cause." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 715 (7th Cir. 2013). "Even law

6

enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

Defendants arrested Patterson for child endangerment.[4] Illinois law defines this crime as knowingly causing or permitting the life or health of a child to be endangered or causing or permitting a child to be placed in circumstances that endanger the child's life or health. 720 Ill. Comp. Stat. 5/12C-5.[5] The Illinois Supreme Court has held that the term endanger "refers to a potential or possibility of injury" and "does not refer to conduct that will result or actually results in harm, but rather to conduct that could or might result in harm." *People v. Jordan*, 843 N.E.2d 870, 879, 218 Ill. 2d 255, 300 Ill. Dec. 270 (2006) (quoting *People v. Collins*, 824 N.E.2d 262, 266, 214 Ill. 2d 206, 291 Ill. Dec. 686 (2005)).

---

[4] Probable cause defeats a § 1983 claims for false arrest "if the arresting officer had probable cause to make the arrest for any reason." *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 154–54, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)). Thus, even if Defendants did not have probable cause to arrest Patterson for child endangerment, Defendants will prevail if they had probable cause to arrest Patterson for any offense. *Id.* (although defendants did not have probable cause to arrest plaintiff for driving under the influence, the false arrest claim fails because defendants had probable cause to arrest plaintiff for disorderly conduct); *Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011) ("The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim."). Defendants briefly mention, although do not clearly argue the applicability of, the criminal statute for contributing to the dependency and neglect of a minor, which is defined to include causing or aiding a minor to become dependent and neglected, doing acts which directly tend to render a minor dependent and neglected, or failing to do that which will directly tend to prevent a state of dependency and neglect. 720 Ill. Comp. Stat. 5/12C-25. A dependent and neglected minor includes a child without "proper parental care or guardianship" or one who "has a home which by reason of neglect, cruelty or depravity on the part of its parents, guardian or any other person in whose care it may be is an unfit place for such child." *Id.* Because Defendants do not make any arguments as to why probable cause existed for this charge, as opposed to that for child endangerment, the Court will not discuss it further. *See United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]" (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000))).

[5] Defendants cited to the predecessor statute, 720 Ill. Comp. Stat. 5/12-21.6A, in their reports.

Here, Defendants arrived at the Star Inn, a motel they knew to have frequent police activity and believed to be an unsafe place for children. They entered Room 235 and found Patterson's older child on the bed, chewing a cigarette lighter, in a dirty shirt and a diaper filled with urine. They found her younger child buried beneath two pillows on the floor in his car seat, also in a dirty shirt and a diaper filled with urine. No adults were present in the room. The room appeared a disaster zone, with food, clothes, dirty baby bottles, and trash strewn about. Defendants found beer bottles on the floor and countertop, a cup containing what smelled like alcohol on a table, and a baggie of suspected cannabis and razors on the floor. While Defendants were in the room, the older child attempted to place a razor and old baby bottle in his mouth, play with leftover spaghetti, and drink from a closed bottle of baby oil. And when Wascher and Remer found Patterson sitting in her car in the Star Inn's parking lot, she gave conflicting explanations for why she was not in the room with her children and indicated that she had seen the police arrive but did not think they were looking for her or in her room.

But Patterson argues that Defendants had no evidence of her intent to endanger her children so as to support a finding of probable cause. When Wascher and Remer encountered Patterson, although she had several explanations for why she was not in the room with her children, she remained consistent in insisting that Peji was in the room with the children. Additionally, when she returned to the room, she made bottles for her children and changed their diapers, suggesting a nurturing side that Wascher and Remer observed. And once Patterson indicated to Defendants that Peji had injured her, causing her to flee the room, Patterson contends the Defendants should have investigated that issue further. But Defendants respond that even taking into account Peji's actions toward Patterson, this does not fully explain the

8

dangerous, unhealthy, and unsanitary conditions in which they found Patterson's children, which allowed them to infer Patterson's intent.

The parties' dispute as to whether probable cause or arguable probable cause existed centers around their interpretation of the Seventh Circuit's decision in *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986). In *BeVier*, the defendant officers arrested parents for child neglect after learning that one of the children had previously been taken to the hospital and finding the children in direct sunlight on an extremely hot day, "listless, filthy, and living near machinery and livestock." *Id.* at 126. The Seventh Circuit found that the officers did not have evidence of the parents' intent, especially in light of their knowledge that the father had taken his son to the hospital and had hired a new babysitter to care for the children while the parents worked. *Id.* at 126–27. The court found the officers' failure to question the parents unreasonable, noting that "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest" and requiring that officers pursue "[r]easonable avenues of investigation . . . especially when . . . it is unclear whether a crime ha[s] even taken place." *Id.* at 128.

Here, unlike in *BeVier*, Defendants had some evidence supporting each of the required elements of the child endangerment charge. Although probable cause requires "more than bare suspicion," it "need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (citation omitted). Good police practice might have required a more thorough investigation, given that Patterson showed Remer and Wascher her injuries and indicated she fled the room after Peji hit her. But "the Constitution does not require police to follow the best recommended practices." *Gramenos v. Jewel Cos.*, 797 F.2d 432, 442 (7th Cir. 1986). Given the totality of the circumstances and the record before the Court, Defendants had

9

probable cause to arrest Patterson based on the condition of the room, the condition of the children, and the fact that they had been left unattended, even considering the fact that Patterson was the victim of domestic violence shortly before the officers arrived on the scene. Aware of the possibility of harm to the children given the disarray of the room, the number of unsafe items at their disposal, and Patterson's behavior, the circumstances reasonably allowed Defendants to infer Patterson's intent. At that point, under established case law, with the elements of the crime of child endangerment established, they did not need to investigate further. *See McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ("An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once an officer has established probable cause, he may end his investigation."); *BeVier*, 806 F.2d at 128 ("[A]n officer who has established cause on every element of the crime need not continue investigating to check out leads or test the suspect's claim of innocence." (citing *Gramenos*, 797 F.2d at 437–42)). Nor did they have to inquire further regarding Patterson's claim of domestic violence, where that claim did not conclusively negate the elements of the child endangerment charge for which probable cause existed, notwithstanding the circumstances surrounding Peji's actions towards Patterson, given the dangerous and unhealthy conditions in which Wascher and Remer discovered the children. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) ("A police officer may not ignore conclusively established evidence of the existence of an affirmative defense . . . but the officer has no duty to investigate the validity of any defense.").

Even if Defendants were mistaken in their probable cause determination, they are still entitled to qualified immunity because they made a reasonable conclusion that there was probable cause to arrest. *See Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) ("[Q]ualified

immunity applies not only to those officials who correctly determine that probable cause to arrest exists, but also to those governmental officials who reasonably but mistakenly conclude that it does."). Patterson contends that Defendants were incompetent and so qualified immunity does not apply because they did not conduct an investigation as required by the DCFS manual for mandated reporters. But Defendants' alleged failure to follow DCFS guidelines does not demonstrate incompetence or defeat qualified immunity. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations and police practices."). This is particularly so where Wascher reported the case to DCFS, DCFS took protective custody of the children, and ultimately issued findings against both Patterson and Peji for child neglect, indicating them for a substantial risk of physical injury, an environment injurious to health and welfare by neglect, and inadequate supervision. *Cf. BeVier*, 806 F.2d at 128–29 (finding defendant officer did not act reasonably and was not entitled to qualified immunity where the DCFS investigator informed officer that description of situation did not appear to amount to violation of child neglect statute). Thus, because Defendants had probable cause, or, at the least arguable probable cause, to arrest Patterson, the Court grants summary judgment for Defendants on Patterson's false arrest claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [54]. The Court enters judgment for Defendants and terminates this case.

Dated: November 14, 2017

_____
SARA L. ELLIS
United States District Judge